Thank you, Your Honors. I would like to reserve a few minutes at the end for rebuttal. And what I would like to focus on, unless you have other questions, is two of the issues in this case. There's numerous issues. One has to do with the January 2002 IEP and the standard of review. And the second issue is the March 2004 meeting and whether an actual IEP came out of that meeting. And so I'm going to start with the January 2002 IEP and the standard of review and what the district court thought the standard was that they were to use in order to review that IEP and see if it provided this child with benefit. And I'll submit to you, to Your Honors, that it has to do with the lens you use in order to view whether an IEP is crafted, reasonably crafted, in order to provide a child with benefit. And so what is the standard that we use? The standard previously had been the one that was very detailed in Rowley, and the courts have been using that standard for many years. When the 1997 amendments ñ MS. GOTTLIEB Well, now, you didn't raise that below, that the Rowley standard has changed. And you raised it for the first time on appeal. MS. MCDOWELL That's correct. MS. GOTTLIEB So it seems to me that ñ I mean, we're going to apply the right standard because that's our job. But it seems to me that you waived that issue, which is, if you sat and listened to the other case, it was squarely presented in the other case. MS. MCDOWELL Well, Your Honor, I don't know all the facts of the other case and whether they raised it with the administrative law judge. But we certainly raised it on appeal, and I think we still raised it with the administrative law judge as we argued whether or not that IEP did provide that child with benefit. And the issue has always been, with the January 2002 IEP, is whether it provided him with benefit, whether it took a look at whether or not he was actually meeting his IEP goals and objectives, which he was not, and whether he was actually getting benefit and moving and attaining some success on his scores and on his IEP goals. And that was the issue that the parents brought in August of 2002 that they wanted to discuss with the school district. What they clearly said in all their letters is, we don't think this is working for our child. We don't know how he can go back to your school, back to the same program that has not been working for him. And so the issue then is, how do you measure the benefit? Was he actually receiving benefit? And how did the ALJ know? What did she know as how to look at that? And so the parents then looked at two pieces. They not only looked at attaining goals and objectives, but a major argument with the January 2002 IEP had to do with the blank pages. There's a blank page on that IEP. It's blank, and nobody can write on it now because the school district never did fill it in. And that particular page then looks at how do you provide supplementary aids and services to a child, and how do you provide accommodations both in classrooms and on testing in order to help this child succeed? Now, that page was blank, and when we asked the teachers at the hearing, I asked them, what were you doing? And the teachers responded, I don't know. I think I was doing what the other IEP said, but I the pages were blank. It matters because he was getting Ds and Fs in his classes, his general ed classes and his special ed classes, and it matters because they weren't doing anything. As they wrote that IEP in January of 2002, and they kept those pages blank, and then the school year proceeded throughout the rest of that year through to June, he continued to get Ds and Fs on his – in his classes. He continued to – to not do well. Now, the book wasn't about whether we knew what to do. It was about the fact that he was absent. He was absent, and the parents submit that he was absent because he could not succeed in those classrooms. Did the parents object to the January of 2002 IEP? There's testimony in the record that what Mother said is she felt that she had to sign it, that she had no choice. But there were two – there were several issues about – that came up in that January of 2002 IEP. One had to do – She didn't object, but she gives an explanation later as to why she didn't object, right? That's correct. And how is the school district supposed to know that? Well, I think the school district ended up not knowing during the school year that the parents were struggling with this, but certainly in August when the parents were trying to meet. But I think there's two issues here, Your Honor. One has to do with what the parents' obligation is to object and bring forth their concerns, and what the district's obligation is on their own. What's their affirmative obligation in crafting an IEP, not just at the moment they crafted in January, but then as a student continues to fail throughout the rest of that school year, does the school district have an obligation, even if parents are sitting back and saying nothing, do they have an obligation to say, gee, something's not right here, this isn't working? Well, Your Client contends, I think, that the January 2002 IEP denied SJ. Do we say this fake or do we fair? Fake. Is that how we say it? Okay. Because it did not include a statement of supplementary aids and services. However, it appears that SJ's prior IEP contains such a statement. Why wasn't that sufficient to provide SJ with a fake, particularly because SJ's parents did not object to the prior IEP or the January 2002 IEP? It makes a difference, because that page tells teachers what they're to do. And so when you ask the teachers, what were you doing, what supplementary aids and services were you providing, what accommodations were you providing, every teacher sat back and said, I don't remember, I'm not sure, I think I was doing what the other one said, but I'm not sure. And so then we get back to the issue of whose obligation is it to craft an appropriate IEP? It's the school district's. Does that foreclose a district's argument that the parents didn't know, the parents didn't provide input, therefore we don't have to do it? And I submit to you that that's not correct, that the school district had the obligation, the school district is supposed to be the authority on how to craft these IEPs, and the parents don't always know the right questions to ask. Is the school district responsible for any of this medical care or condition? The school district's responsible for the child who walks through the door. And so if a child has medical conditions, and this young man had a variety of medical conditions, and there was a lot of argument over what medications he should or should not take, he still was the child who walked through the door. And so at what point, then, does a school district have to continue to provide FAPE to a child, regardless of their disability? Do they have to buy him prescriptions? No, absolutely not. Do they have to take the prescriptive remedy and do it every four hours, or whatever it may be? What school districts are required to do is implement a prescription. So if a child comes to school and says, I have a prescription from a doctor, and the doctor says his medication needs to be given, that they are to do that. You know, what I think we're... But don't you claim, as one of your allegations, that the school forced him to take his medication, and therefore made that a condition of his receiving services? Yes, that is one of the allegations, because there's a difference between submitting a prescription from a doctor and the bottle of medication, and having it sit in the nurse's office, and following that prescription, and writing a behavior plan that requires the student to take medication. If you look at the language of the behavior plan, there's two requirements on there. One, take your meds, and number two, comply with adult requests in the first time. And if either of those two things don't happen, you're removed from class. Okay. Well, the law passed after that was in place, and the record seems to indicate that the parents and the school agreed that the school would administer it, because the parents were having problems with it at home, and he never got removed for not taking his medication. So... I submit to you that there's a difference between giving them a prescription to a school, and giving them permission to administering it, and forcing a child to take it, or risk being removed from class. But as I understand it, although the way the IEP was written, it said you have to take your medication. When he didn't take his medication, they didn't terminate his employment, his education. They didn't treat it like a condition of his getting his education. If you look at the record, the parents will say that two years previously, he had been removed from school, and he had to stay out of school until he was medicated. And so when the mother sat down two years later with this staff, and was presented with a behavior plan that said either he takes his medication, or he cannot be in class, she felt coerced. And she clearly said at every single one of the times that she testified, that she felt she had to sign it. She discussed it with her husband, who wasn't at that meeting. But how's the district supposed to know that, I mean, if a person keeps that all inside? How are you supposed to, you know, am I supposed to, are we supposed to, we call this subjective and objective signs under the law. If someone doesn't say something, how are they supposed to know that they're secretly feeling a certain way? I guess, Your Honor, I would go back to what's the affirmative obligation of a school district? Well, what was the law at that time? The law at that time, the IDEA didn't clearly reference whether or not you could forcibly medicate a student to attend, although they do bring it, they didn't bring that into the law until 2004. So they weren't violating the law as it existed at that time? Well, I would like to take a look at what court cases, the only court case that actually referenced this was from a different district, and I talked about the Valerie J. case. But the state of Washington did talk about this issue. And so there were some things in state law that referenced, what does the state think about this? And what I tried to do, and what the family tried to do at the district court level, is ask the district court to present additional evidence on this issue. All those issues were dismissed by the administrative law judge. And she only focused on what the behavior plan said. So we couldn't enter any evidence at the administrative level. When we appealed, when the parents appealed then to the district court, one of the first things the parents did, well, I can't say the first thing because there were some intervening issues, was to ask for additional evidence, which was denied. And so the problems with this case is we haven't been able to present the evidence that shows in the state of Washington that there were laws that said you could not be forcibly medicating this child, both under I.G.A. I can take judicial notice of a law. I'm sorry, Your Honor. If there's a statutory law, you must present the statute, and they can take judicial notice of it in the Federal system. We tried to do that, Your Honor, but the district court judge denied it. You can take a look at the motions that the parents submitted to the district court asking for additional evidence to be able to submit to the court so they could see what Washington state law was saying on this issue. Can you give me a record citation? I can provide that later. But there were motions that – there was motions for this, and the district court judge denied any additional evidence or any The ALJ dismissed all of those – all of those issues that was presented in the original – in the original request for hearing, all of those issues were presented, and the administrative law just dismissed all of them for lack of jurisdiction. Was SJ taking this medication? I thought I read it was Zoloft. Was he taking it under prescription before the school district came up with its behavior plan? Yes. So it's not a situation where the school district says, we're going to require you to take some medication that he wasn't already taking. The issue the parents were presenting at that time was they didn't think the medication was working. And – And also, too, then they submitted another – they submitted another prescription after that, which wasn't at the request of the school district either. Isn't that right? No, that is not correct, Your Honor. It was the same medication that – Another prescription. Did they have another – did they give the school another prescription after the first one? Yes, because their understanding was if they didn't continue to supply those prescriptions, that he would be removed from class. That's what the behavior plan said. Take your medication or you're out of class. And we're going to call your parents and we're going to send you home. And so the family understood that that meant if that child was going to go to school, he had to take the medication as prescribed. And that was their understanding. Okay. I'd like to move for a minute to the – so I only have like a minute. Let me ask you to clarify one point. And we'll give you a little extra time if you need it based on this. But is your contention on the medication under the behavior plan that giving him that medication, which the parents, at least on the face, agreed to, violates his right to a FAPE? Or is it a due process issue that it's like a contention that it violated his due process rights? The parents submit that it's both, Your Honor, because it starts with what is – what are IEPs about and how are they supposed to be crafted in order to help a child achieve certain goals. And if the goal is in the behavior plan to change behavior, to provide the student with skills in order to calm himself down and be able to be available for learning, then it's skills that school districts are supposed to be providing. And I think that the contrast to the behavior plan that the school district crafted is the behavior plan that was crafted the minute he started the private school, which then all the private school people testified that it worked to calm him down early in the process. That behavior plan was about skills. What did the child need to learn to do to calm himself down? It wasn't about taking medication. And so I submit, then, that it's both about FAPE and about state – I agree with your contentions. Now, your time is up on the clock, but we'll add another two minutes for you to make rebuttal arguments. Thank you, Your Honor. Good morning. May it please the Court, I'm Chris Hurst on behalf of Issaquah School District and its employees. I'd like to, if I may, first address a number of the questions that the Court raised with Ms. Cohen. Why don't you start with her argument on the school district's position on the pages that were left blank. What's your position on that? Does the school district have any responsibility for completing these pages, even if the parents did not object? Our response, Your Honor, is that we would invite the Court to look at supplemental excerpts of record pages 447 and 457, which concern the testimony of the special education teacher at the time, and the special education teacher testified with no contrary evidence to indicate that the prior year's accommodations and supplementals were provided during the year in question, and therefore, if there was error, it was entirely harmless. That's our position concerning that point. Concerning the medication, we believe the record is entirely consistent in indicating that there had been a previous request by the family with a prescription and physician instructions for this medication to be provided at school, and it was merely incorporated with the parents' involvement in the behavior plan, and at no time, as was indicated, I think, in one of the Court's questions, was there any objection at the time made by the parents. It was made much later. What about the language? Does the language sound a little bit different than maybe what the agreement was? Well, the language does preserve the opportunity for sending a student home, but that question isn't before you because it never happened, and therefore, if there was any error including that language, again, we would submit to you that that is harmless error concerning that issue. Concerning the additional evidence question that was addressed to Ms. Cohen, we would invite the Court's attention to pages 28 to 32, which is the district court's ruling on that, and you will find that the district court had many ample reasons for denying the request for additional evidence that was requested at the district court level, and that those – that denial is – does not represent any abuse of discretion, which would be your standard for review. I personally heard her say it was in front of the ALG. Was it __________________________________________________________________________________________________________________________________________________ She asked for additional evidence at the district court that was not submitted to the administrative law judge, Your Honor. Next, I'd like to turn my attention to the – By the way, on that, do we review for abuse of discretion? Yes. Like a district court decision not to take additional evidence? I believe that the statute – Or to review it to no vote? My apologies, Your Honor. It is my understanding that in this context of IDEA, the statute expressly gives the discretion to the district court to decide what additional evidence will be admitted, and that's also been interpreted by rulings of this court. Concerning the 2002 IEP, just very briefly, I would point out a couple of things. First of all, the administrative law judge and the district court properly applied what has been the standard in this circuit for a long time, which is, was that IEP reasonably calculated to confirm meaningful educational benefit? That's what they applied in the administrative law judge case. She applied that in light of all the testimony of all the witnesses, various credibility, and determined that it, in fact, did, and that the student's struggle with grades had to do with absences unrelated to his disability. There's ample evidence to support that in the record, and, in fact, was affirmed by the district court. And those findings are reviewed only for abuse of discretion, and there is no abuse of discretion to be found in this record. The next point I would make, though, is that if you'll recall from the briefing of the family in this case, they indicated that what they want as a result of their concerns about the 2002 IEP is they want reimbursement for the private school that commenced in the fall of 2002, 2003. And as the administrative law judge determined and the district court affirmed, they failed to give the proper notice under IDEA. And as I learned from your questions in the earlier case, you're aware of that obligation. They gave six days' notice in this case. There's no dispute that they did not give the ten-day notice required, and the statute expressly authorizes the administrative law judge and the district court to deny, reduce or deny, but in this case, they denied reimbursement for the private school based on that failure to give the notice, that would be reviewed for abuse of discretion. That was when the teachers were out and there was a strike, right? That's correct. But the student then remained. Yeah. But the statute, my point is, statute expressly authorized that ruling, and how could that be an abuse of discretion is the point I'm making concerning that issue. The next point that I'd like to briefly talk about is the composition of the IEP team for March 2004. As you will recall that the administrative law judge and the district administrative law judge determined that we didn't have the right people at the IEP meeting in September 2003 and therefore ordered reimbursement for the period September 2003 through March 2004. We believe we have the right people according to the ruling of this court in the RB versus Napa Valley School District case at the March 2004 IEP meeting because we had a former special education teacher of the student. We had a future regular education teacher of the student who would be responsible for his IEP as well as we solicited and then obtained the participation of a representative from the private school at that meeting. We would also submit to you, though, that the RB decision came out after the administrative law judge issued her order, and she may have reached a different conclusion as the district court suggested concerning the composition of the IEP team in September 2003. We did not appeal that. That's not before you, but it is related to the parents' request for more equitable relief from this court than what they got from the administrative law judge and the district court. We submit to you that they probably got more than what they were entitled to in light of the RB case. We would urge this court to endorse the reasoning of the RB court in terms of who needs to be at an IEP meeting because it's rational, it's based on the language of the statute and the regulation that existed in 1997 and reflects a careful analysis by the court that Congress changed the language of the statute going from the teacher of the student to at least one teacher of the student, both on the regular ed and special ed side, and the RB court looked to guidance from the federal agency with jurisdiction on this matter, the Office of Special Education Programs, in determining that you don't have to have the current teacher of the student. We had a former special ed teacher. So what you're saying is rather than say that the March meeting cured the defect, you're saying there was no defect? Exactly. Even though you're not going to get any relief either way on that? That's exactly what I'm saying, Your Honor. And then also we would urge this court to endorse, if you find that there is some procedural error, we don't believe there is any under the RB analysis, if you do find there's some procedural error in terms of the composition of the team, we urge you to engage in the harmless error analysis that Judge Gould indicated was appropriate in the ML v. Federal Way decision and, as the court went into some detail in expanding or discussing that notion in the RB decision, and we believe that when you do that, it will be very clear to you that if there was any error, and again, we indicate to you that there was no error in the composition of the team, it was indeed an error entirely harmless error if there was any, because we had the input of the former special education teacher of the student, we had the input from the private school by way of records that they supplied, we had the participation of the representative of the private school who the record makes clear had met a couple weeks earlier to prepare for that meeting and was invited to comment on goals and objectives and declined to do so, and therefore there's harmless error, and perhaps at least, last but certainly not least, the administrative law judge, after hearing all of the evidence in this case concerning the IEP team composition and the composition and the substance of that IEP, as well as the evaluation information, determined that it was reasonably calculated to confer meaningful educational benefit. Now, the parents also argue, in addition to their team composition argument, they claim that the IEP in March 2004 was really a fait accompli, it was a take-it-or-leave-it type of thing because there were only a couple of adjustments made from the earlier drafts in September of 2003 and January 2004. Those arguments are not supported by the record. If you look at the notices of action that followed each of those meetings, you can clearly track the changes that were made between the meetings, between January and March, for example, there were additional occupational therapy elements added to the IEP, and fundamentally this was not a fait accompli, and the parents argue that it was because they disagreed with the placement decision that the school team was recommending. The parents don't have the right to veto a school team's, an IEP team's, notion concerning what is a least restrictive environment for the student, which is really what this boils down to in this case, because the school team felt that this student needed an environment that would give him regular access to general education students to help him through some of his behavior issues as he was ready, and by contrast, the parents wanted a private school, which is entirely made up of special education students. In this Court's decision in the Ms. S. versus Dash on Island case, this Court indicated that the parents don't have the right to dictate placement, they have a right to challenge if they disagree with it, but the Court is going to be reluctant to examine or reexamine or question those notions in the circumstance, as we have here, where we have a difference of educational philosophy. The difference between the parents and the school team in this case is the school team wanted a less restrictive, entirely special education private school environment. What does the law require you to do in terms of placing students if, let's just say if it had been the opposite, that the parents wanted a less restrictive environment and you wanted to put them in a more restrictive environment, but the evidence, I mean, are you required to put someone in the least restrictive environment under the law? The law is clear that we are, the school districts are, and this school district would be required to educate the student in the environment that is least restrictive to that individual student's needs. To answer your question more fully, in that circumstance, the school district would be expected to develop a proposal, provide it to the parents in the way of an IEP, and with a prior written notice saying that they're proposing this as an IEP and they're rejecting, say, for example, a less restrictive, and explain why. So that would be the obligation of the district, and they offered the program, so the way the system would work is then the parent who may disagree with that would then be in a position to challenge that in a due process hearing. Well, now, it seems to me, though, that Appellant raised in the reply brief for the first time, they're making a Raleigh challenge as well. Should we address that? Well, I hope not, and I would say not for two reasons. A, it was not, as you correctly pointed out in an earlier question, it was not raised before the Administrative Law Judge, and it wasn't raised until the reply brief, as you just said. In this case, under both of those reasons, we don't believe it's properly before the court in this case. If you decide to look at the issue, I would think... We have to look at the law, obviously, and we have to evaluate the Raleigh standard in light of Adams, and I guess if someone, if the 1997 law's amendments changed Raleigh, then we would have to apply the proper standard, but that issue wasn't the basis of any of the challenges down below, was it? That's correct, Your Honor, but when you do go to apply the standard to this case, we would suggest to you that Raleigh hasn't changed. Raleigh talked about educational benefit. The law in this circuit for a long time has been meaningful educational benefit. That's exactly the standard that both the Administrative Law Judge and the District Court in this case applied, and we believe it's the right standard for you to apply to our case as well as the case just heard before you, and I would also add just one more point concerning this, and that is if Congress really were to change by adding a substantive standard to IDEA, it had to do it unambiguously under the Spending Clause cases that I've seen in Mr. Dionne's brief before this Court. It hasn't done that in this case, despite the arguments to the contrary. In fact, Congress knows how to do it. They showed that they know how to do it in 2004, changes to IDEA, when they added certain elements that are necessary to determine whether or not a procedural error has denied a student a FAPE or free appropriate public education. They have not adopted a substantive standard, and so we suggest to you that the standard this Court has used for a long time of meaningful educational benefit is alive and well in the Ninth Circuit. To sum up, if I may, we'd like to rely on the balance of our points unless the Court has other questions. And just in very brief summary, I would indicate that this case is before you following a very long hearing with a well-reasoned administrative law judge decision that was entirely affirmed by the district courts, denying any further relief to the parents, and we ask you to affirm it in its entirety. Thanks very much. Thank you, Mr. Hearst. Okay, Ms. Stone, we're giving you an extra two minutes. Please do your rebuttal in that time. Thank you, Your Honor. I'd like to point out a couple of things about that March 2004 meeting and the September and the January IEPs. The student at question had been out of the district by March of 2004 for a year and a half. This district had never contacted the teachers. The teachers were not involved, his current teachers, the teachers at his private school, were not involved in the development of those IEPs. It wasn't just a procedural error that they weren't at the table. It was a substantive error. They did not have current information on how that young man was doing. And when they brought everybody together at that March meeting, they didn't intend, you could tell by looking at the document, whether they intended to actually change anything. Because what they did is they took that January IEP that was developed without any teacher who knew that child, and they put a cover sheet on it that said March of 2004. Underneath it is the identical January IEP with all the January dates. And so it's more about what was the intent of that meeting. How did that meeting come about? Parents at that point had filed for due process hearing, and the hearing was moving along when this district suddenly had this March meeting. You also have to note from the record that the teachers involved in developing that January IEP never saw that child until May, days before they were to testify. And the schools are about a half an hour apart at the most. So we're not talking about a big distance. Now the last point I want to leave you with has to do with Rowley and the change in 97. And I would submit for you to think about the fact that the parents did raise this. They raised this all along in having the courts look at what was the standard to apply in order to view whether or not the child was receiving benefit from his IEPs. And do you look at access, mere access as a look at what 97 says, which is attaining goals and objectives. And we'd submit that that issue was raised all along. Now how old was this child at the time? The child at the time was in sixth grade when the hearing started. So he was 12 turning 13 when he started. But don't the 97 amendments start talking about doing the transitional planning at 14? They talk about transition planning at 14. I'm referencing the composition, the way an IEP is to be developed. And if you look at the statute for the development of the IEP, which is at 1414 small d1 capital A, the difference between what 97 said about attaining goals for all students with IEPs is a very large difference from what the previous statute said would just develop measurable goals. So Congress really thought about what Rowley had been saying. They didn't reference Rowley, but they certainly referenced everything Rowley discussed when they talked about shifting from a basic floor of opportunity and just walking through the door to actually meeting goals. And it matters for this child because he was sitting in those seats, but he wasn't learning anything. And you can see that based on Ds and Fs on all his grades and not making progress on his goals and objectives. It matters for him. Thank you. Thank you. Judge Peter, Judge Callan, do we have more? Okay, thank you. We thank Ms. Callan and Mr. Hirsch for their excellent arguments. And SJ versus Issaquah School District shall be submitted. We turn to the last piece.
judges: Beezer, Gould, Callahan